IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

CRYSTAL D. TAYLOR, )
 )
      Plaintiff, )
 )
vs. ) Case No. 11-CV-57-TLW
 )
MICHAEL J. ASTRUE, )
Commissioner of the Social Security )
Administration, )
 )
      Defendant. )

## OPINION AND ORDER

Plaintiff Crystal D. Taylor requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff's applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i) & 423, 1382c(a)(3) *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 9). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

Plaintiff appeals the decision of the Administrative Law Judge ("ALJ"), asserting that the ALJ failed to: (1) demonstrate plaintiff had the ability to perform the jobs identified at step five; and (2) perform a proper credibility determination. (Dkt. # 12 at 1). For the reasons discussed below, this Court REMANDS the decision of the Commissioner.

## Procedural History

On June 19, 2006, plaintiff protectively filed her Title II application for disability and disability insurance benefits, as well as a Title XVI application for supplemental security income. (R. 11). In both applications, plaintiff alleged an onset date of June 2, 2006. Id.

Plaintiff's application was administratively denied initially and on reconsideration. Plaintiff filed a timely written request for a hearing on June 14, 2007, and the final hearing occurred before an Administrative Law Judge ("ALJ") on February 26, 2009, in Tulsa, OK. (R. 11.) The ALJ issued a decision on March 25, 2009, denying plaintiff's claims for disability and disability insurance, and also denied plaintiff's claim for supplemental security income. (R. 23). On December 2, 2010, the Appeals Council denied plaintiff's application for review of the ALJ's decision. (R. 1). The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481. On August 25, 2011, plaintiff timely filed the subject action with this court. (Dkt. # 12 at 7).

## Background

At the time of her hearing before the ALJ on February 26, 2009, plaintiff was 32 years old. (R. 30). Plaintiff completed the twelfth grade, but did not receive a diploma.[1] (R. 33). Plaintiff testified that she received special education in the area of reading and continues to have trouble with reading and comprehension.[2] (R. 34, 271). Plaintiff attended one semester at Tulsa Junior College, taking a course in business law and receiving a grade of "D." (R. 34). Plaintiff has been married and divorced twice; she is currently unmarried. (R. 31, 272). Plaintiff has two children: a son, age 11, from a non-marital relationship and a daughter, age seven, from her second marriage. (R. 272). During her second divorce, plaintiff failed a drug test and, as a result, lost custody of her daughter to her ex-husband. (R. 273). Plaintiff has lunch with her daughter at school once a week, and her son lives with her mother. (R. 186, 199).

---

[1] Plaintiff lacked one-half credit to complete the educational requirements necessary to receive a diploma.

[2] Plaintiff attempted to obtain her GED in 1995, but failed the reading portion of the exam.

At her hearing, plaintiff testified that she has no source of income and is completely dependent upon her parents. (R. 32, 236-7). When describing her disability, plaintiff stated she doesn't "follow directions very easily" and "[has] a hard time concentrating" and "understand[ing]." (R. 35). During her testimony, plaintiff reported that she had been regularly taking Lithium "twice a day" for "two years." (R. 41). Plaintiff listed the effects of her prescription as causing her to "sleep a lot." (R. 42). When questioned about her daily activities, plaintiff testified that she tries to play the piano for thirty minutes a day, drives her son to sport practices and games, cleans her mother's house, makes dinner, and has lunch with her daughter once a week. (R. 36-7). In her Disability Report, plaintiff also mentioned cooking for ten minutes a day, doing chores for one to two hours a day, visiting garage sales roughly three times a week, and talking on the phone or visiting friends daily. (R. 202).

In plaintiff's Disability Report – Adult, plaintiff claims she has difficulty following instructions, getting along with others, and concentrating. (R. 163, 203). Plaintiff blames these difficulties on her bipolar disorder—which she lists as an illness that limits her ability to work. (R. 163). When asked if her illness prevented her from doing anything that she was previously able to do, plaintiff said no. (R. 199). She further describes the effects of her illness by stating, "[w]hen I have an episode I stay in bed most of the day. I don't want to clean up or dress up. In [the] mornings my hands are clenched shut. I am depressed and have [a] hard time coping." (R. 221). Plaintiff's mother, Ardith King, submitted a Function Report – Adult (Third Party), in which she provided information that largely repeats the information provided by plaintiff in the Disability Report. (R. 181-8). King does elaborate somewhat by saying that plaintiff only cleans for ten minutes at a time because she is easily distracted. (R. 183). King also notes that plaintiff ". . . leaves milk out, leaves bread out, doesn't clean up spills." Id. Due to her illness, King

wrote, "On bad days she stays in bed and refuses to answer the phone." (R. 181). On such days, King visits plaintiff's home to ensure she eats and is taken care of. (R. 183). According to King, plaintiff is affected by her mental disorder "about 1/2 the time." Id. With respect to social activities, King attests to plaintiff's shopping habits, but adds that plaintiff only lasts ten minutes in a store because, "her attention span is so short she can't stand to do any task for very long." (R. 184). Moreover, King characterizes plaintiff's social relationships as limited in number, stating that plaintiff "drives them off" and "alienates" them. (R. 185-6). King explains that she is "the only family member who has anything to do with her." (R. 186). "The children don't even want to see her," King continues. Id. According to King, when plaintiff does have friends she usually talks to them on the phone, if it's one of "her good days." (R. 185).

Plaintiff's pertinent medical records begin with an examination on March 23, 2006[3] conducted by Dr. Murray Crow, one of multiple treating physicians. (R. 233-34). Dr. Crow noted that plaintiff's hands were particularly stiff in the mornings and that she had difficulty opening them. (R. 233). Aside from plaintiffs' stiff hands, Dr. Crow noted that plaintiff was prescribed Prozac before she had children, and was currently suffering from anxiety and depression. (R. 233-34). Dr. Crow formally diagnosed plaintiff with Anxiety and Bi-polar disorder. Id. Dr. Crow prescribed a 0.1mg Clonidine patch for the stiffness in her hands and Lithobid (Lithium). (R. 234). During the examination, Dr. Crow made no notations or observations that indicated plaintiff was presently—or had previously been—under the influence of methamphetamines or any other street drugs.[4]

---

[3] The record contains documentation that plaintiff was seen by Dr. Crow on April 25, 2002 for strep throat and again on September 24, 2005 for a cough. (R. 267-68). Neither of these documents indicates that plaintiff was on any medications or drugs. (R. 267-68).

[4] The ALJ found plaintiff's substance abuse was a material factor to her disability, and, as a result, concluded that she did not qualify as disabled.

4

The first documented evidence of plaintiff's drug use is nearly one year later, on January 4, 2007, when plaintiff visited Dr. Crow regarding an abscess growth on her scalp and neck. (R. 228-32). Once again, Dr. Crow noted plaintiff's anxiety and authorized a refill of Lithium for her depression. (R. 228). Dr. Crow also noted that plaintiff had used methamphetamines within the last ten days and informed plaintiff that the abscess was caused by her methamphetamine use. Id. Approximately two weeks later, on January 17, 2007, plaintiff underwent a Social Security Disability Consultative Evaluation conducted by psychologist Linda R. Craig, Psy.D. (R. 235-38). During this evaluation, Dr. Craig noted that plaintiff's "[m]ood was depressed," her "ability to concentrate was limited," and her "[m]emory appeared somewhat compromised."[5] Dr. Craig sighted "no signs of psychosis." (R. 235). During her evaluation, plaintiff "complained of the following symptoms: depression, avoidance of social activities, chronic sadness, problems with attention and concentration, grief and loss issues." Id. Additionally, Dr. Craig noted that plaintiff had suffered from Attention Deficit Disorder "since childhood."[6] (R. 236). Dr. Craig also documented plaintiff's use of methamphetamines, to which plaintiff stated that her "last use [was] in November 2006." Id. When asked "if she was through using methamphetamines," plaintiff "provided a blank stare." Id.

In summarizing her evaluation, Dr. Craig found plaintiff's symptoms "consistent with major depressive disorder and ADHD." (R. 237). Dr. Craig further concluded that there was "no evidence of malingering or secondary gain, under-reporting or over-reporting of symptoms." Id. Plaintiff's abilities were listed as "severely impaired with respect to understanding complex

---

[5] Plaintiff could not name the President of the United States, to which Dr. Craig noted a "low" fund of information.

[6] According to plaintiff, she was diagnosed with Attention Deficit Disorder as a child and placed on Ritalin, but was switched to Prozac as an adult. (R. 270-71).

instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers or the public." (R. 237).

After her disability evaluation, plaintiff received a Mental Residual Functional Capacity Assessment from Dr. Ron Smallwood on January 22, 2007. (R. 239-42). Dr. Smallwood's findings were consistent with Dr. Craig's. For section I-A, Understanding and Memory, Dr. Smallwood found plaintiff's ability to understand and remember detailed instructions as "markedly limited." (R. 239). Under section I-B, Sustained Concentration and Persistence, Dr. Smallwood found plaintiff's ability to carry out detailed instructions as "markedly limited." Id. This same day, Dr. Smallwood also conducted a Psychiatric Review of plaintiff. (R. 243-56). Under section C. 12.04, Affective Disorder, Dr. Smallwood lists plaintiff as suffering from "disturbance of mood, accompanied by a full or partial manic or depressive syndrome" evidenced by appetite and sleep disturbance. (R. 246).

Nearly one year later, on January 2, 2008, plaintiff returned to Dr. Crow's office complaining of worsened symptoms in her hands. (R. 265). Dr. Crow noted that plaintiff had been suffering for roughly two years from numbness in her hands and loss of grip. Id. Specifically, Dr. Crow reported plaintiff's grip had continued to deteriorate at an increasing rate over the previous six months. Id. Dr. Crow diagnosed plaintiff with Parasthesia of the bilateral upper extremities and recommended she receive an EMG. (R. 296). Moreover, Dr. Crow made separate note that plaintiff continued treatment for Bipolar disorder with Lithium, as previously prescribed. (R. 265).

Shortly thereafter, on January 11, 2008, plaintiff was referred by Dr. Jahangir Khan to Dr. Shashi Husain for bipolar disorder and neuropathy of the hands[7]. (R. 263). The referral form states that, at that time, plaintiff was "recovering from meth two weeks." Id. On January 22, 2008, plaintiff met with Dr. Husain for the numbness in her hands. (R. 261). Dr. Husain reported that plaintiff could not hold small objects and that her numbness was "progressively getting worse." Id. The physical examination form lists plaintiff's current medications as Clonidine and lithium—consistent with Dr. Crow's original prescription on March 23, 2006. Id. Dr. Husain reported "[p]ossible carpal tunnel syndrome" and recommended that plaintiff "have an EMG and nerve conduction velocity study of both upper extremities." Id. Plaintiff complied with Dr. Husain's recommendation, and on January 30, 2008, she underwent an EMG and nerve conduction velocity study of both upper extremities. (R. 260). The results of the tests suggested "bilateral carpal tunnel syndrome, more on the right than on the left." (R. 260).

Approximately eight months later, on October 13, 2008, Clinical Psychologist, Dr. John W. Hickman, conducted plaintiff's Disability Evaluation Report. (R. 270-82). Plaintiff informed Dr. Hickman that she was presently taking 1200 mg per day of Lithium and had been doing so for the past two years. (R. 271). Plaintiff went on to say that she used methamphetamine and marijuana to cope with the depression of losing custody of her daughter during her divorce. Id. She stated that prior to being prescribed lithium she had difficulty controlling her anger. Id.

Dr. Hickman administered a variety of tests and, with regard to the validity of plaintiff's responses, found that they "indicate[d] a low probability of insufficient effort or attempt to malinger in her responses." (R. 275). As usual, plaintiff's mood was reported as "depressed." (R. 272). Dr. Hickman noted that plaintiff "burst into tears . . . when talking about her family and

---

[7] The record is silent on whether Dr. Crow remained plaintiff's primary care provider, or if she transferred to Dr. Khan's services permanently.

marriage difficulties." (R. 272). During this portion of the examination, plaintiff stated that prior to starting lithium she had "more difficulty with irritability and anger management." (R. 273). Plaintiff also reported "obsessive ideation about the loss of custody of her daughter." Id. With regard to substance abuse, plaintiff informed Dr. Hickman that she smoked a half-pack of cigarettes a day but "denied any use of street drugs." Id. Additionally, plaintiff stated that she previously "used methamphetamine for about six months three years ago." Id.

The tests further reported that plaintiff had "marked difficulty maintaining her concentration over a prolonged period of time." (R. 274). Moreover, the Personality Functions section indicated that plaintiff was "being consistent in her responses and reasonably open and candid about herself." (R. 275). Dr. Hickman specifically noted that plaintiff had a mildly elevated "8-7-5-2 profile" and "endorsed a severe number of strange and unusual statements" which he warned "could be interpreted as a cry for help, a reflection of severe psychopathology, or an over-reporting of her difficulties." Id.

Dr. Hickman indicated that individuals with such characteristics "experience[e] moderate emotional distress characterized by dysphoria, brooding and agitation. They are chronically stressed and become more agitated and withdrawn as their level of stress increases. . . . [these individuals] have difficulty thinking and their concentration is poor. . . . [and they] lack self-confidence and give up quickly when things go wrong." Id. He concluded that individuals with a profile like plaintiff's have a "poor" prognosis. Id. Dr. Hickman found that plaintiff's current level of functioning was "markedly impaired" with respect to mental adaptability and that she had "difficulty sustaining her concentration." (R. 276). On the MMPI-2 content scale, plaintiff showed "mild anxiety and depression, more moderate difficulty concentrating and thinking, and a severe number of bizarre sensory experiences." Id. Dr. Hickman noted that plaintiff "ha[d]

8

marked elevations on the Mac R and alcohol addiction supplementary scales and her highest elevation among the content component scales was on suicidal ideation although she had denied it in the interview." (R. 276).

The final diagnosis of Dr. Hickman's examination stated that plaintiff was suffering from Bipolar disorder, "depressed type", with features of dependent personality disorder and marked personality difficulties. Id. Dr. Hickman also found that plaintiff suffered from neuropathy of the hands and marked psychosocial stress. Id. In closing, Dr. Hickman's written opinion stated that plaintiff's "immaturity, poor social skills, low frustration tolerance and low motivation will make it difficult but not impossible for her to sustain employment." Id. In all, Dr. Hickman "[did] not think [plaintiff] currently [met] or equal[ed] any disability criteria although she ha[d] moderately limited social functions." Id.

On October 22, 2008, plaintiff underwent a Residual Functional Capacity Evaluation conducted by Dr. Sherman B. Lawton. (R. 283-88). Dr. Lawton confirmed that plaintiff did appear to suffer from carpal tunnel syndrome, and he opined that this was "easily fixed" but that "for some reason fixing this problem d[id] not appear to have been suggested"[8] by her previous physicians. (R. 283). Dr. Lawton noted that plaintiff stated she received an MRI scan of her brain and an EEG, both of which were abnormal.[9] Id. Concerning physical capabilities, Dr. Lawton reported that, throughout an eight hour work day, plaintiff could sit for eight hours, stand for six hours, and walk for two hours. Id. In addition, plaintiff's abilities include lifting and carrying six to twenty pounds continuously, twenty-one to twenty-five pounds frequently and twenty-six to fifty pounds occasionally. Id. Dr. Lawton opined that plaintiff could only bend, squat, crawl,

---

[8] Dr. Lawton did not suggest any course of treatment to correct plaintiff's carpal tunnel syndrome either.

[9] Dr. Lawton did not initially have record of the scans but a post-examination note states that Dr. Lawton "found [the] EEG report" but it was "incomprehensible." (R. 284).

climb, or reach "occasionally." (R. 287). Overall, Dr. Lawton found that plaintiff's residual functional capacity test results were normal, yet again stated that plaintiff had "easily fixed" moderate carpal tunnel syndrome. (R. 284, 287).

Approximately two months later, on January 9, 2009, plaintiff sought medical treatment from Dr. Khan concerning her depression. (R. 290). Dr. Khan once again confirmed plaintiff's depression and Bipolar disorder, but also noted she was suffering from anxiety. Id. As treatment, Dr. Khan referred plaintiff to "psych." Id.

On August 06, 2010, plaintiff visited Psychiatric Associates of Tulsa. (R. 305-06). On examination, the treating physician noted that plaintiff showed symptoms of impulsive behavior and extreme mood swings, and he or she ultimately diagnosed her with Bipolar disorder Type I. (R. 306-07).

## Standard of Review and Social Security Law

Under the Social Security Act ("SSA"), disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To qualify as disabled under the SSA, a plaintiff must have a "physical or mental impairment . . . of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Per Social Security Regulations, a five-step sequential evaluation process is followed to evaluate a disability claim, and "[i]f a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." 20 C.F.R. §§ 404.1520, 416.920. See also Williams v. Bowen, 844 F.2d 748, 750-53 (10th Cir. 1988) (detailing steps).

Regarding drug and alcohol cases, special statutes and regulations have been enacted to govern the evaluation process. The Contract with America Advancement Act of 1996 ("the Act") requires an additional step to the typical five-step sequential evaluation for claimants with drug addiction and alcoholism. Pub. L. No. 104-121, 110 Stat. 848, 852 (enacted March 29, 1996). The Act provides that, "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would [but for this subparagraph] be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). See also McGoffin v. Barnhart, 288 F.3d 1248, 1251 (10th Cir. 2011).

In reviewing this appeal, the Court is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision and whether the proper legal standards were applied. See 42 U.S.C. § 405(g); Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1497-1498 (10th Cir. 1992). Substantial evidence is defined as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1028 (10th Cir. 1994); see also Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). However, "a decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there a mere scintilla of evidence supporting it." Salazar v. Barnhart, 468 F.3d 615, 621 (10th Cir. 2006) (citing Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)); Broadbent v. Harris, 698 F.2d 407, 414 (10th Cir. 1983) (per curiam). This Court is charged with the duty of meticulously examining the record and making its determination on the record as a whole. Castellano, 26 F.3d at 1028. In this inquiry, the Court may "neither reweigh the evidence nor substitute our judgment for that of the agency." Id.

### Decision of the Administrative Law Judge

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 2, 2006. At step two, the ALJ concluded that plaintiff had the following severe impairments: "bipolar disorder, substance abuse and carpal tunnel syndrome."[10]

At step three, the ALJ found plaintiff's mental impairments, including the substance use disorder, to meet 12.04 and 12.09 of the Commissioner's listed impairments. (R. 14). Generally, if plaintiff's impairment(s) are listed in the listings, or if the impairment is "medically equivalent" to a listed impairment and Paragraphs A[11] and B[12] are satisfied, then plaintiff is determined to be disabled without further inquiry. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1546, 416.920(d), 416.925, 416.926. In this case, the ALJ found plaintiff's Bipolar disorder satisfied Paragraph A and B, but concluded that, "if the substance abuse ended, the [plaintiff] would have mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace" and therefore the plaintiff would not be disabled. (R. 14). The ALJ came to this conclusion because, "[plaintiff's] substance abuse has undoubtedly interfered

---

[10] Plaintiff also alleged anxiety as a severe impairment but the ALJ found it to be, "non-severe in regard to the plaintiff" because, "the medical evidence of record d[id] not substantiate the severity of this condition. Anxiety is mentioned in a 2006 progress note, but is not found thereafter. This condition does not meet the 12 month durational requirement[.]" (R. 14). However, the record reflects that anxiety was mentioned continuously from 2006 to 2009. (R. 228, 234, 278, 290).

[11] The "Paragraph A Criteria" in the Listing of Impairments catalogue's the organic mental disorders that satisfy the criteria. The two main categories are: (1) depressive syndrome and (2) manic syndrome. 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.

[12] The "Paragraph B Criteria" in the Listing of Impairments establishes broad categories used to assess the severity of a mental impairment. To satisfy Paragraph B, the impairments must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration; persistence or pace; and (4) repeated episodes of decompensation. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. See also Carpenter v. Astrue, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

with her prescribed treatment for bipolar disorder." (R. 21). And since, "20 C.F.R. 404.1530 provides that in order to receive benefits the [plaintiff] must follow treatment prescribed by her physician if the treatment can restore her ability to work" and "if any individual does not follow prescribed treatment without good reason the Administration will find that person 'not disabled,'" the ALJ found plaintiff not disabled, with her only remaining impairment being carpal tunnel syndrome. (R. 21). The ALJ proceeded to analyze plaintiff's disability at steps four and five with regard to her carpal tunnel syndrome.

The ALJ found plaintiff to have the RFC to "lift and carry 50 pounds occasionally, 25 pounds frequently, push and pull consist [sic] with lift and carry limits, to stand 6 hours out of an 8-hour day, and to sit for 8 hours out of an 8-hour day." (R. 20). The ALJ limited plaintiff to, "walking two hours out of an 8-hour day, to occasionally using stairs, bending, stooping, crawling, crouching, and extended reaching, to simple tasks in a habituated work place and object-oriented setting, and to superficial contact with supervisors, co-workers and the public." Id. Plaintiff was also precluded from, "power gripping, torqueing or twisting." Id. Because plaintiff's step four burden was met, the burden shifted to the Commissioner at step five to establish that work existed in significant numbers in the national economy which plaintiff, considering her education, age, work experience, and RFC, could perform.

At step five, the ALJ relied on the VE's testimony. (R. 23). A review of the hearing transcript shows the ALJ presented the VE with the following hypothetical:

> "[A] 32-year-old individual with a. . . high school education. . .we want to make sure that reading is the minimus in any jobs that we provide for. . . [l]ifting up to 50 pounds occasionally, 25 pounds frequently, pushing and pulling consistent with the lifting and carrying. She can stand for six hours in an eight-hour day and walk for two hours out of an eight-hour day but not stand for more than two hours or walk for more than one hours at a time. She can sit for eight hours in an eight-hour day. She could occasionally climb stairs, bend or stop, kneel, crouch, and crawl. . . she's limited to occasional extended reaching in all

13

directions. . .[i]f it's an extended reach any direction, then I don't want her doing that. There's some evidence of carpal tunnel syndrome. . . [t]he individual can do simple tasks. I want it to be habituated, object-oriented. I don't want her working with people much. In fact superficial contact with coworkers and supervisors and the public as well." (R. 59).

In response to this hypothetical, the VE listed three jobs that plaintiff could perform: (1) hand packager; (2) a laundry worker; and (3) a laborer. (R. 59). As such, the ALJ concluded that "if the claimant stopped the substance use, she would be capable of making a successful adjustment to work that exists in significant number in the national economy." (R. 23).

## **Discussion**

Plaintiff first argues that the ALJ conducted a faulty determination at step five, because the ALJ failed to demonstrate plaintiff had the ability to perform the jobs provided.

The hypothetical from the ALJ "must include all [and only] those impairments borne out by the evidentiary record." Smith v. Barnhart, 172 Fed.Appx. 795, 800 (10th Cir. 2006) (citing Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995)). Additionally, all hypotheticals must be precise. Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991). At the hearing, the ALJ's hypothetical provided: "[S]he's limited to occasional extended reaching in all directions. . .[i]f it's an extended reach any direction, then I don't want her doing that. There's some evidence of carpal tunnel syndrome." In response, the VE stated that the hypothetical individual would be employable as a hand packer, laundry worker, and laborer. In support of her position, plaintiff states that she cannot perform the jobs provided by the VE because she is limited to occasional reaching, while the jobs listed require frequent or constant reaching. The medical record specifically shows that plaintiff's reaching abilities are limited to "occasional," as reflected in Dr. Lawton's RFC evaluation. (R. 18, 287).

14

This limitation, according to the Dictionary of Occupational Titles ("DOT"),[13] allows for reaching *up to* one third of the time. Dictionary of Occupational Titles, 4th Ed. Rev., 1991 (emphasis added). Therefore, the jobs suggested by the VE cannot contain a reaching requirement greater than one third of the time. The first position provided by the VE, a hand packer, requires constant reaching, "existing 2/3 or more of the time." Dictionary of Occupational Titles § 920.587-018. The second position the VE listed was a laborer, which requires frequent reaching, "existing 1/3 to 2/3 of the time." Dictionary of Occupational Titles § 589.686-026. Similarly, the third occupation listed, a laundry worker, requires frequent reaching, "existing 1/3 to 2/3 of the time." Dictionary of Occupational Titles § 361.687-018. Accordingly, none of the jobs provided accommodates occasional reaching.

Based on the above information, each job provided by the VE exceeds plaintiff's RFC. The reaching requirements for the occupations listed range from frequent reaching to constant reaching. Dictionary of Occupational Titles, 4th Ed. Rev., 1991. Because the RFC is the maximum the plaintiff can do, each of the jobs listed require plaintiff to reach—and exceed—her maximum physical capabilities.

Next, plaintiff argues that the ALJ failed to perform a proper credibility determination. Generally, an ALJ's credibility determinations are treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). An ALJ's credibility findings warrant particular deference, because he is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002); Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993). Thus, the ALJ's credibility

---

[13] In order to determine if any jobs exist that a plaintiff can perform, the ALJ consults the Dictionary of Occupational Titles, a publication by the United States Department of Labor, which describes the requirements for jobs that exist in the national economy.

determination will stand if supported by substantial evidence. Gay, 986 F.2d at 1341 (10th Cir. 1993).

While the ALJ must specify reasons for questioning a plaintiff's credibility (Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992)), a "formalistic factor-by-factor recitation of the evidence" is not required, so long as the specific evidence used to analyze plaintiff's credibility is identified. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). In analyzing a plaintiff's credibility, an ALJ may consider the individual's daily activities, measures other than treatment the plaintiff uses or has used to relieve pain, and other factors concerning the plaintiff's functional limitation and restrictions due to pain. See SSR 96-7p (identifying factors). Here, the ALJ considered these factors.

In doing so, the ALJ cited several inconsistencies with plaintiff's statements and found her credibility "questionable." (R. 20). In regard to plaintiff's functional limitations and restrictions, the ALJ found that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms" but concluded that plaintiff's subjective complaints of symptoms were not credible to the extent the statements were inconsistent with the residual functional capacity assessment. Id. Next, the ALJ discussed plaintiff's medical treatments and pain relieving measures. Here, the ALJ stated, "there is no evidence, other than the inconsistent statements by the claimant, that the claimant has stopped using methamphetamine." (R. 21). The ALJ focused on the lack of medical evidence showing any attempts by plaintiff to treat her drug addiction.[14] (R. 20). For this reason, the ALJ concluded that "the record as a whole, clearly

---

[14] "There is no evidence that the claimant has been through a detoxification or substance abuse treatment program to stop suing methamphetamine and marijuana. There is no objective evidence, such as urinalysis, to corroborate the claimant's statements as to drug abuse being in remission for various periods in the record. . . . The claimant has provided no evidence that she

show[s] [plaintiff] is non-compliant and has continued to use methamphetamines and marijuana, against doctor's orders." (R. 21).

The ALJ noted that, in January of 2008, plaintiff told Dr. Khan that she was "two weeks recovering from methamphetamine use," yet, in October of that same year, plaintiff informed Dr. Hickman that her "last use of methamphetamine was three years prior to that evaluation." (R. 20). The ALJ went on to state that, "the record as a whole, clearly show[s] [plaintiff] is non-compliant and has continued to use methamphetamines and marijuana, against doctor's orders." (R. 21). Additionally, the ALJ cited King's testimony that plaintiff received food stamps (R. 52), and noted that, to the contrary, plaintiff testified she had not received food stamps for "[t]hree to four months" (R. 32), and that she "offered no explanation as to how she buys groceries." (R. 21).

Based on the foregoing, the undersigned affirms the ALJ's credibility determination.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REMANDED as set forth herein.

SO ORDERED this 13th day of August, 2012.

_____
T. Lane Wilson
United States Magistrate Judge

---

has sought and been denied medical treatment [for her drug abuse] from her treating sources" (R. 20).

17